Lloyd Nolan v. Commissioner. Mell Efird Nolan v. Commissioner.
Nolan v. Commissioner
Docket Nos. 4505, 4506.
United States Tax Court
1946 Tax Ct. Memo LEXIS 149; 5 T.C.M. (CCH) 546; T.C.M. (RIA) 46160; June 28, 1946
Stevens Fargo, Esq., and Silas P. Rice, C.P.A., 9009 Wilshire Blvd., Beverly Hills, Calif., for the petitioners. Earl C. Crouter, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The respondent determined deficiencies in the income tax of each of the petitioners in the amount of $2,707.68, or a total of $5,515.36 for the taxable year ended December 31, 1941. The sole question presented is whether the petitioners are entitled to deductions aggregating $15,000 on account of damage sustained to apricot trees as a result of excessive rainfall during the winter of 1940 and the spring of 1941. Findings of Fact Petitioners are husband and wife and reside in Beverly Hills, California. For the year 1941 they filed separate *150 individual tax returns on the community property basis with the collector of internal revenue for the sixth collection district of California. In arriving at their 1941 community income, the petitioners claimed, in the return of Lloyd Nolan, a deduction of $14,000 on account of "losses from storm (uninsured), damage done to apricot grove by flood waters in spring of 1941." A schedule under Item 14 stated: 35 acres of full bearing apricot orchard damaged and removed - estimated value of $400 per acre, $14,00. The respondent determined that the petitioners were not entitled to the deductions claimed on account of loss from storm and disallowed them,"for the reason that no deductible loss was sustained." The Beverly Management Corporation is engaged in personal business management and acts as agent for actors and others. It collects for its clients their entire salaries, handles their budgets, financial planning, and attends to all matters that normally concern the individual in his or her business. It acquires, manages and operates, and sells properties for its clients. At all times material herein two of its clients were Lloyd Nolan and Harry Frederick Wilcoxon. In the latter *151 part of 1940 Wilcoxon, a motion picture actor, owned a ranch containing about 107 acres of land located on the Ventura Boulevard, about 30 miles northwest of the Los Angeles city limits. This ranch was managed for him during 1940 and prior years by the Beverly Management Corporation. Twenty-one acres were devoted to the raising of beans in 1940 and other acreage was devoted to the raising of oats and hay. The property, which had been neglected for several years, also had an apricot orchard covering 35 acres. This orchard had not been "kept up" by Wilcoxon during the period of his ownership and during 1940, it had not been sprayed or fully cultivated. Wilcoxon's financial condition was not good and the Beverly Management Corporation maintained the orchard as well as it could with limited finances. During 1940, $600 was realized from the sale of apricots, and this amount merely paid the expenses of operation. In California the average apricot production per acre is six tons, and the average cost of production $33 per ton. The average price per fresh ton of apricots to the grower was $37 in 1937, $35 in 1938, $33 in 1939, $53 in 1940, and $45 in 1941. In December of 1940, Nolan became *152 interested in purchasing the ranch, and on February 15, 1941, he wrote to Wilcoxon, as follows: This will represent my agreement to enter into the purchase of your ranch at Newbury Park, California. I hand you herewith $10.00 to be held as evidence of agreement to purchase this property. It is my understanding that the property shall include 107 acres of land together with all buildings and equipment which may be attached this date. And, therefore, ask at this time that you remove this property from the market as it is my understanding that other purchasers have been negotiating. I wish to assure myself that through this agreement I may eventually gain all rights to this property. On March 11, 1941, the property was placed in escrow with the Security First-National Bank of Los Angeles by Wilcoxon and his wife, as sellers, and the petitioners as buyers, under written escrow instructions which provided for payment of the total sum of $25,500, of which $13,500 would be in cash, through the escrow, and $12,000 applied on outstanding encumbrances; the property to be "free of encumbrances" except taxes from 1940 to 1942; the "close of escrow" to mean "the day papers are filed for record"; *153 and the grantor agreeing to clear the property of any tax thereon. The escrow conditions also expressly provide: If the conditions of this escrow have not been complied with at the time provided herein you are nevertheless to complete the same as soon as the conditions (except as to time) have been complied with, unless I shall have made written demand upon you for the return of money and/or instruments deposited by me. The escrow also provided for completion "on or before April 11, 1941." The transfer of title to the property passed from Wilcoxon and his wife to the petitioners by deed dated May 1, 1941, and recorded November 1, 1941. The reason for the long escrow was that Nolan was unable to meet his commitments in the escrow until shortly before the escrow was closed, due to failure of certain motion picture work to materialize. The time of performance on the purchasers' part was extended by the seller. From and after February of 1941, when he caused the property to be surveyed, Nolan was in possession, and the expenses of operating the ranch were paid by him. During the winter of 1940 and the spring of 1941, the section of California in which the ranch was located was *154 subjected to unusually heavy rainfall which lasted two and one-half months longer than it normally did. Apricot trees normally leaf out and blossom in this area during the latter part of April. The wet weather and wet condition of the soil adversely affected the trees on the ranch and the surrounding area, causing many of them to fail to fully leaf out and blossom, and creating a condition known as "gummosis." Trees affected by "gummosis" do not leaf out fully, exude a gum, and do not produce fruit. A representative of the Beverly Management Corporation inspected the apricot trees on the ranch in the latter part of May 1941, discovered that the area in the center of the grove "was not leafing out as much as the rest." He told Nolan about this condition in July and stated that he did not then anticipate that there would be any serious loss beyond a bad jolt to the trees that would cut down production for a couple of years. As the season progressed, he noticed that two-thirds of the apricot trees in the center section of the grove appeared to be unhealthy and affected. In August or September of 1941, he had all of the trees, except twenty on the fringe of the grove, removed. At that *155 time "probably" three-fourths of the trees removed were dead, and the remaining trees were either so badly damaged as to have no further use as far as production was concerned or were in such a position on the property that economical operation, as a grove, was impracticable. Opinion Section 23 (e), I.R.C., provides that in computing net income there shall be allowed as deductions losses arising from storms or other casualty. The petitioners contend that they were the owners of the ranch at the time the damage by elements to the land and trees was sustained and that they are entitled to deduct the amount of $10,250 for damage resulting from destruction of the apricot orchard "by reason of a disease caused from rain storms." No contention is made that any loss was sustained in petitioner's trade or business. The respondent contends that petitioners are not entitled to any deduction for any loss or damage to any apricot trees or property during 1941. He urges that there was no loss from "storms" or "other casualty"; that petitioners did not own the property when the damage was sustained; and that they have failed to establish any basis for the losses claimed. *156 The evidence introduced by petitioners does not convince us that they sustained a deductible loss. Neither of the petitioners testified at the hearing, and we do not know of their plans, if they had any, for the operation of the ranch and orchard. A representative of the Beverly Management Corporation who did testify stated that when Nolan inspected the ranch prior to writing the letter of February 15, 1941, and approved its purchase, he did not state what he wanted it for but left that up to the Beverly Management Corporation. The witness stated that he explained to Nolan at that time that production had been very low and that the apricot trees were backward because they had not been "kept up" and had been neglected during the period the ranch had been owned by Wilcoxon - from 1936 to 1941. There is nothing to show that Wilcoxon ever made a profit from the operation of the orchard, and he did not realize any in 1940. Thus, it clearly appears that the petitioners or their representatives knew at the time the agreement to purchase the ranch was entered into in 1941, that there was on the property a neglected apricot orchard which had not been operated at a profit. Just how badly *157 neglected this orchard was at the time it was acquired by petitioners may be gathered from an analysis of a chart prepared by petitioners' witness and introduced in evidence by the respondent. This chart shows that the average price per fresh ton of apricots to the growers in California dropped from $53 a ton in 1940 to $45 a ton in 1941. In 1940, $600 was realized from the sale of apricots produced on the orchard and this amount was barely sufficient to cover the expenses of operation. Obviously, the prospects of operating the orchard at a profit in 1941 when the price dropped were not good. The chart also discloses that in 1940 the average production per acre of apricots in California was six tons. It seems to us that if the orchard had been in good condition it should have produced on the thirty five acres approximately two hundred tons of apricots. Judging from the income realized of $600 in 1940, and the average price per ton of $53 in that year, the production could not have been much in excess of twelve tons. This low rate of production indicates that in 1940 the orchard must have been in such a neglected condition that the apricot trees should have been removed regardless of *158 excessive rainfall or gummosis. Petitioners' witness testified that in August or September of 1941 "probably" three fourths of the trees removed were dead and that about 80 percent of the trees on an orchard on a neighboring ranch owned by a man named Borchard had been lost. Borchard, who also testified as a witness for petitioners, described the damage caused by the excessive rainfall and gummosis on his seventy-acre orchard, as follows: Well, they [the trees] leafed out kind of sparingly, and the leaves stayed small. And where the trees were not affected or where the trees were healthy they were in full leaf and they leafed out fully. And naturally, you couldn't help but notice there was something wrong with the trees. On closer examination * * * you would find that this gummosis was all over the trees; it was very noticeable. The gum comes out of the trees, out of the limbs, out of the main trunk of the tree and all over the tree. The tree may not be dead, but it is affected. Q. What did you do in respect to the trees of your own grove which apparently had the gummosis? A. We allowed * * * them to grow, thinking that perhaps the wet years may change and the trees may snap *159 out of it. After two and a half, after three years we pulled them out because they were deteriorating right along. They were just going backward. There was a - oh, you would see dead limbs come on the trees. And there would be less growth and the trees weren't dead, but you could tell they were very sick. Q. Did you eventually remove some of the affected trees from your grove? A. Yes, eventually we took out 10 acres. It is apparent from the foregoing that only one seventh of the trees on the Borchard orchard, not 80 percent, eventually died as a result of the gummosis condition resulting from the extra-heavy rains, and that this condition did not kill the affected trees in 1941. While what happened on the Borchard ranch is not necessarily an indication of what happened on petitioners', his testimony that the damage done by the heavy rains eventually required the removal of ten of his seventy acres caused us to doubt that three-fourths of the trees on petitioners' orchard, which was on "sloping and well drained land", could have been killed in 1941 as a result of the excessive rainfall. The death of three-fourths of the trees on petitioners' ranch when compared with the experience *160 of Borchard on a neighboring ranch, leads us to believe that the high rate of mortality of petitioner's trees must have been attributable to some other cause than excessive rains and might conceivably have been due to the neglect of the orchard during the period of ownership by the Wilcoxons. Cf. Eaton v. Commissioner, 81 Fed. (2d) 332. No useful purpose will be served by discussing the opinion expressed by a real estate broker, who testified as a witness for petitioners, that the value of the apricot trees removed was $10,250. Suffice to say, that his testimony, in the light of other evidence reflecting the condition of the orchard at the time it was acquired, is not convincing. Our conclusion is that the petitioners have not proved that in 1941 they sustained any deductible loss from storms or other casualty. Having reached this conclusion, we deem it unnecessary to consider the respondent's contention that petitioners did not own the ranch if and when any damage from storms or other casualty was sustained in 1941. Judgment will be entered for the respondent.